*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOSHUN EDWARDS,

        Defendant-Appellant.

UNPUBLISHED
October 22, 2020

No. 348753
Genesee Circuit Court
LC No. 08-022016-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KINO DOMINQUE CHRISTIAN,

        Defendant-Appellant.

No. 348807
Genesee Circuit Court
LC No. 08-022018-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

C'QUAN MICHAEL HINTON,

        Defendant-Appellant.

No. 349585
Genesee Circuit Court
LC No. 08-022017-FC

---

Before: LETICA, P.J., and K. F. KELLY and REDFORD, JJ.

PER CURIAM.

-1-

In these consolidated appeals, defendants Joshun Edwards (Docket No. 348753), Kino Dominque Christian (Docket No. 348807), and C'Quan Michael Hinton (Docket No. 349585), each appeal by delayed leave granted the trial court's opinion and order denying their motions for relief from judgment. All three defendants were originally convicted in February 2009, at a joint jury trial, of first-degree premeditated murder, MCL 750.316(1)(a), assault with intent to commit murder, MCL 750.83, carrying a concealed weapon ("CCW"), MCL 750.227, and possession of a firearm during the commission of a felony, MCL 750.227b.[1] Defendants Christian and Edwards were also each convicted of felon in possession of a firearm, MCL 750.224f.[2]

This Court previously affirmed defendants' convictions and sentences on direct appeal, and the Michigan Supreme Court denied their applications for leave to appeal. *People v Christian*; *People v Hinton*; *People v Edwards*, unpublished per curiam opinion of the Michigan Court of Appeals, issued September 22, 2011 (Docket Nos. 291578, 291687, 291744), lv den 492 Mich 864 (2012) (Edwards and Hinton) and lv den 492 Mich 865 (2012) (Christian). In 2017, defendants Edwards, Christian, and Hinton each moved in the trial court for relief from judgment on the ground that the prosecution failed to produce before trial a transcript of an October 16, 2007, police interview of Jarylle Murphy, a key prosecution witness at trial, which defendants argued would have enabled them to impeach Murphy's inculpatory trial testimony. Hinton also sought relief on the ground that his trial counsel provided him ineffective assistance unrelated to the transcript. Defendants now appeal by delayed leave granted the trial court's opinion and order denying their motions. We affirm in each case.

---

[1] A fourth codefendant, Dartanion Edwards, was convicted of these same offenses but did not move for relief from judgment and is not a party to these appeals.

[2] The trial court sentenced Edwards as a fourth-offense habitual offender, MCL 769.12, to life imprisonment without parole for the first-degree murder conviction, and concurrent prison terms of 270 to 470 months for the assault conviction and 24 to 60 months each for the felon-in-possession and CCW convictions, to be served consecutively to a two-year term of imprisonment for the felony-firearm conviction. The trial court sentenced Christian as a second-offense habitual offender, MCL 769.10, to life imprisonment without parole for the first-degree murder conviction, and concurrent prison terms of 108 to 220 months for the assault conviction and 19 to 60 months each for the felon-in-possession and CCW convictions, to be served consecutively to a two-year term of imprisonment for the felony-firearm conviction. The trial court sentenced Hinton to life imprisonment without parole for the first-degree murder conviction, and concurrent prison terms of 15 to 30 years for the assault conviction and one to five years for the CCW conviction, to be served consecutively to a two-year term of imprisonment for the felony-firearm conviction. Hinton was a 17-year-old juvenile at the time of the offense. On January 31, 2015, the trial court resentenced Hinton pursuant to MCL 769.25 and *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), to a term of 32 to 60 years' imprisonment for the first-degree murder conviction. Hinton's sentence is not at issue in this appeal.

## I. FACTUAL BACKGROUND

The facts giving rise to defendants' convictions are summarized in this Court's previous opinion as follows:

Evidence was presented at trial that defendants Christian and Hinton approached 14-year-old Robert Person on October 9, 2007, while Person was walking with Jarylle Murphy in the vicinity of the Regency apartment complex in Flint. Christian and Hinton accused Person of being a "snitch" and threatened to "get" him for snitching. Person was still with Murphy later in the day when Murphy saw all four defendants behind them. Murphy explained that he looked back because he is self-conscious about people being behind him. Murphy spoke to Person and then looked back at the group a second time. He saw the defendants pull out guns. Murphy ran away and heard gunshots as he was running. Person died from multiple gunshot wounds. A 7.62 by 39 millimeter fired bullet was recovered from Person's body during an autopsy.

The police later recovered a .38 caliber gun that was linked to shell casings that were found at the scene of the shooting. That gun belonged to William Harris's girlfriend, but the prosecution presented evidence that defendant Christian hid the gun behind a gas station following a different shooting incident on October 13, 2007, during which Perry Manuel was shot while operating a vehicle in which defendant Christian was a passenger. On October 16, 2007, Murphy viewed a photographic lineup and identified defendant Hinton as one of the persons in the group who shot Person. In November 2007, Murphy identified the other three defendants in photographic lineups.

Robert Moore, who was lodged in jail with defendants Christian and [Edwards] after they were arrested, testified at trial that defendants Christian and [Edwards] both told him that they had killed Person and that both sought his help in killing Murphy. Another prosecution witness, Ashlie Dye, who was familiar with defendant Christian and was in the area where Person was shot, testified that she saw defendant Christian shooting at Person.

Defense proofs indicated that three of the defendants ended up at the Terrace apartments, which is located south of the Regency apartment complex, on the night of the shooting. Defendant Dartanion presented evidence that he was with two friends when the shooting occurred, and that they eventually drove to the Terrace apartments, where Dartanion's brother Joshun [Edwards] told them about a boy being killed in front of the Regency apartment complex. Defendant [Edwards] presented evidence that he was in the parking lot at the Terrace apartments when the shooting occurred, and that he learned about the shooting from Mickey Jones, who was at the Terrace apartments. Defendant [Edwards] also stated that he spoke with defendant Hinton while [Edwards] was in the parking lot. Defendant Christian presented evidence that he was selling drugs on the night of the shooting. He testified that Manuel, Harris, and a person known as "Pooh Bear" were present, but that these individuals left with guns after receiving a telephone

-3-

call. Various witnesses also testified regarding Harris and Manuel making statements about shooting Person. Jesse Mays testified that he killed Manuel, but it was determined to be a justifiable homicide. Mays testified that Manual told him approximately three weeks before he died that he had shot Person and that all four defendants were innocent. [*People v Christian, People v Hinton, People v Edwards*, unpub op at 2-3.]

Before trial, the police interviewed Murphy on two different dates: October 16, 2007, and November 8, 2007. During each interview, Murphy made statements, portions of which were inconsistent with statements provided in the other interview, and inconsistent with the testimony he provided at trial. The police provided defendants with a summary report of Murphy's October 16 interview, and an actual transcript of Murphy's November 8, 2007 interview. During trial, defendants used these documents to impeach Murphy's trial testimony and challenge his credibility with his inconsistent statements. Defendants attacked Murphy's ability to identify the shooters and suggested that he fabricated being with Person during the time period leading up to and including the shooting.

In 2014, a member of Edwards's family filed a Freedom of Information Act (FOIA) request, MCL 15.231 *et seq*., and discovered that a transcript of Murphy's October 16, 2007 police interview had also been prepared but never provided to any of the defendants. In 2017, defendants moved for relief from judgment. Defendants variously argued that (1) the prosecution improperly suppressed the transcript, thereby violating their right to due process under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), (2) the prosecution presented false and misleading testimony at trial, or failed to take affirmative steps to correct such testimony when it occurred, by knowingly denying or failing to disclose the existence of the transcript, (3) the discovery of the transcript constituted newly discovered evidence warranting a new trial, and (4) defendants were denied the effective assistance of trial and appellate counsel. The trial court disagreed and denied defendants' motions.[3] This Court granted defendants' delayed applications for leave to appeal.

## II. STANDARDS OF REVIEW

We review for an abuse of discretion a trial court's decision on a motion for relief from judgment and review for clear error its findings of facts supporting its decision. *People v Swain*, 288 Mich App 609, 628; 794 NW2d 92 (2010). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes or makes an error of law." *Id*. (citations omitted). A mere difference in judicial opinion between this Court and the trial court does not establish an abuse of discretion. *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018). "A finding is clearly erroneous if this Court is left with the definite and firm conviction that a mistake has been made." *People v Allen*, 295 Mich App 277, 281; 813 NW2d 806 (2011) (citation omitted). We review de novo whether the prosecution committed a *Brady* violation which

---

[3] The trial court memorialized its conclusions in the matters giving rise to the instant appeals in a detailed 12-page, single-spaced opinion and order on November 27, 2018. He presided over the entire trial, sentencing, and resentencing phases of all matters in these cases. The judge has been a circuit judge for 22 years.

is an issue of constitutional law. *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016).

III. ANALYSIS

At the time defendants filed their motions for relief from judgment in 2018, MCR 6.508 provided in pertinent part:

> (D) The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion
>
> * * *
>
> (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;
>
> (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates
>
> (a) good cause for failure to raise such grounds on appeal or in the prior motion, and
>
> (b) actual prejudice from the alleged irregularities that support the claim for relief. As used in this subrule, "actual prejudice" means that,
>
> (*i*) in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal[.]

In *Swain*, 288 Mich App at 629-630, this Court explained the procedure for reviewing a motion for relief from judgment:

> A motion for relief from judgment is to be presented to the judge to whom the case was assigned at the time of the defendant's conviction. MCR 6.504(A). The court is required to "promptly examine" the motion and all files, records, transcripts, and correspondence relating to the judgment under attack. MCR 6.504(B)(1). If it is plainly apparent that the defendant is not entitled to relief, the court must deny the motion. MCR 6.504(B)(2). If the court does not dismiss the entire motion, it must order the prosecution "to file a response as provided in MCR 6.506, and shall conduct further proceedings as provided in MCR 6.505-6.508." MCR 6.504(B)(4).
>
> The court, after reviewing the motion, response, record, and any record expansion, must then decide whether an evidentiary hearing is required. MCR 6.508(B). If it determines that a hearing is not required, the court may rule on the motion for relief from judgment or afford the parties an opportunity for oral

-5-

argument. *Id*. If the court decides that an evidentiary hearing is required, it shall schedule and conduct a hearing. MCR 6.508(C).

The defendant bears the onus of establishing that he is entitled to relief. *Id*. at 630.

## A. *BRADY* VIOLATION

Defendants first argue that the trial court erred by denying their motions for relief from judgment on the basis of an alleged *Brady* violation. We disagree.

Defendants do not dispute that they knew that the police interviewed Murphy on October 16, 2007, that they were provided a written summary of that interview, that they knew that the police interviewed Murphy again on November 8, 2017, and that defendants were provided a written transcript of that interview. Further, the parties do not dispute that the prosecution did not provide defendants a transcript of Murphy's October 16, 2007 interview before trial. At trial, Murphy testified about being present when defendants shot Person and he identified all three defendants as participants in the shooting. Defendants impeached Murphy's credibility by introducing evidence of his prior inconsistent statements and argued that Murphy fabricated his testimony about being with Person during the time leading up to and including the shooting. Defendants argue in these appeals that the transcript of Murphy's October 16, 2007 police interview could have furthered their efforts to impeach Murphy's credibility and the suppression of this evidence violated their right to due process under *Brady*.

In *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014) (quoting *Brady*, 373 US at 87), our Supreme Court recognized that " 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " To establish a *Brady* violation, a defendant must satisfy the following three elements: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *Id*. at 150.

The trial court found that the police possessed the transcript of Murphy's October 16, 2007 interview, and therefore, that the prosecution suppressed it as contemplated by *Brady*. The trial court further concluded that the transcript contained evidence favorable to all three defendants because it could have been used to impeach Murphy's "credibility and undermine his identification of the defendants." The trial court, however, found that the suppression of this evidence did not establish a *Brady* violation because the evidence lacked materiality.

In *Chenault*, 495 Mich at 150-151, our Supreme Court explained the materiality element:

> To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v Bagley*, 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985). This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." [*Kyles v Whitley*, 514 US 419, 434; 115 S Ct 1555; 131 L Ed 2d 490 (1995)]. The question is whether, in the absence of the suppressed evidence, the defendant "received a

fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. *Id*. at 436.

More recently, in *Turner v United States*, ___ US ___, ___; 137 S Ct 1885, 1893; 198 L Ed 2d 443 (2017) (quotation marks and citations omitted), the United States Supreme Court explained that in resolving this "legally simple but factually complex" question, a trial court must view the withheld evidence against the entire record, and "in light of that examination," determine "whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."

Defendants essentially argue that failure to disclose the transcript of Murphy's October 16, 2007 interview deprived them of the opportunity to undermine Murphy's credibility by questioning him regarding discrepancies between his two statements to the police on separate occasions and the discrepancy with his trial testimony. Defendants point out that Murphy identified Edwards, Christian, and Hinton as three of the shooters involved in killing Person on October 9, 2007. The trial court recognized the importance of Murphy's testimony, characterizing him as a "significant eyewitness." The trial court, however, did not err by rejecting defendants' arguments that they were deprived the opportunity to undermine Murphy's credibility respecting his identification of them as the shooters. The record supports the trial court's observations which, as noted above, were based on the trial judge's personal and direct observation of the entire trial process, that Murphy's credibility and frailties with his eyewitness identifications were prominent themes that pervaded defendants' trial and defense counsels' cross-examinations of Murphy. The record reflects that defendants attacked Murphy's identification testimony. Further, although defendants assert that suppression of the transcript of the October 16, 2007 interview deprived them of the opportunity to challenge Murphy's claimed presence with Person at the time of the shooting and his entire recitation of the events of October 9, 2007, the record reflects that defendants advanced as a key defense theory that Murphy was not present, and therefore, he fabricated his entire story. Defendants raised the alleged inconsistencies between Murphy's trial testimony and his statements in both police interviews.

The record reflects that discrepancies existed between Murphy's October 16, 2007 police statement and his trial testimony, and that they are not entirely insignificant. For example, Murphy recounted at trial that, on October 9, 2007, after basketball practice at Haskell's Community Center, he met up with his sister Shamonica Murphy, and they traveled by bus to the south side of Flint to visit her uncle. After staying there for 30 to 45 minutes, they walked to the Evergreen Regency apartments and on the way met Person, went to Person's house to eat, and after saying goodbye to Shamonica, Person and Murphy were approached by two men who accused Person of being a snitch and told him "they were going to get him." After that interaction, Person obtained a phone charger and a bicycle from some girls in a van, and on the way to a nearby party store Person and Murphy came into contact with an unknown female who they walked home to the Johnson Estate apartments. They returned to the Evergreen Regency apartments where Murphy and Person were approached by four men who started shooting at them. At trial, Murphy stated that he was "positive" that Edwards, Christian, Hinton, and Dartanion were the shooters. Murphy also testified that he and Person were together for three to five hours on October 9, 2007, before Person was shot.

Murphy's October 16, 2007 interview with the police differed from his trial testimony in several ways. Murphy stated early in the interview that he and Shamonica took a bus around 6:30 p.m. He explained that a van pulled up after Shamonica called her friends and did not mention that Person rode a bicycle at any point. Murphy stated that when confronted by the two men they accused Person of snitching and said "Man, we don't like snitches. My moms don't play with no snitches." Murphy did not mention this in his trial testimony. In his October 16, 2007 interview, Murphy stated that Person and the two men who confronted them engaged in a verbal altercation regarding gang affiliations. Murphy did not mention this in detail at trial. Murphy also stated during the October 16, 2007 interview that the men and Person engaged in a dispute concerning marijuana. Murphy, however, did not mention this in his trial testimony. During his October 16, 2007 statement, Murphy mentioned that the girl with long black hair may have been present at the time of the shooting. He thought they were sitting on the sidewalk before being approached by the four shooters. During his October 16, 2007 interview, Murphy stated that the man who shot Person rode a bicycle. At trial he testified that Person had a bicycle. Murphy also indicated in the October 16, 2007 interview that he had difficulty seeing the shooters' faces because it was dark out. He thought he could identify the two men who initially confronted him and Person, but he expressed doubt whether he could identify the other two men who shot Person.

The trial court observed that, during cross-examination at trial, defense counsel questioned Murphy extensively concerning his versions of events. Counsel for Dartanion and counsel for Edwards both cross-examined Murphy extensively regarding his preliminary examination testimony during which he testified that he and Person had not visited a store before the shooting. Dartanion's counsel questioned Murphy regarding whether Person's bicycle was black as he described during the preliminary examination or gray and purple as he testified during direct examination at trial. Defense counsel also cross-examined Murphy about his preliminary examination testimony in which he testified that he only saw the assailants for five seconds, that as soon as shots rang out he turned his back to the assailants, that he viewed the assailants at a distance ranging from 35 to 50 feet, and that he told Sergeant Lee Ann Gaspar and the prosecutor during his November 8, 2007 interview that he could not see the suspects well. Edwards's counsel pressed Murphy regarding which of the four suspects was his client, and further questioned him regarding which of the assailants wore hoodies. Edwards's counsel also cross-examined Murphy about his preliminary examination testimony in which he testified that he saw two police cars as he fled the gunshots, facts he did not mention during his direct examination at trial.

Christian's counsel, while noting that Murphy had professed to have a photographic memory, elicited from Murphy his concession that he could not recall the clothing that the two men wore when they initially confronted him and Person. Christian's counsel also questioned Murphy regarding where the four assailants were standing when they began shooting, their physical proximity to a nearby streetlight, and his detailed recollection of each suspect's physical appearance and clothing, which he supposedly obtained within five seconds from a considerable distance and while fleeing gunfire. Hinton's counsel discredited Murphy's self-professed photographic memory by asking him to write down what Hinton and his counsel wore the day before in court. Murphy failed to do so. Murphy also testified that Hinton had no facial hair the day before at trial but the record reflects that he had a mustache.

Although defense counsel for Edwards, Christian, and Hinton lacked possession of the October 16, 2007 transcript, the record reflects that they each ably and thoroughly cross-examined

Murphy regarding his ability to recall the pertinent events of October 9, 2007, and ability to identify defendants. Their cross-examinations revealed the limitations of Murphy's memory and challenged his ability to identify all three defendants with any certainty.

The dispositive inquiry in assessing materiality, however, is whether the result of defendants' trial would have been different had defendants had the suppressed evidence. *Turner*, 137 S Ct at 1893. In this case, the record does not indicate that a reasonable probability exists that, had the evidence been disclosed, the result of the proceedings would have been different. At most, if the October 16, 2007 transcript had been produced, defendants could have questioned Murphy regarding other details of his recollections of events, but such cross-examination likely would not have cast reasonable doubt on defendants' guilt. The jury returned guilty verdicts respecting all three defendants based upon all of the evidence presented by the prosecution which included testimonies from several witnesses plus direct and circumstantial evidence. We are not persuaded that the result of defendants' trial would have been different had defendants questioned Murphy regarding the discrepancies apparent in the transcript of his October 16, 2007 police interview which varied slightly from other discrepancies of which defense counsel made the jury aware.

Edwards and Hinton argue that, had they had the transcript of Murphy's October 16, 2007 statement to the police, they could have used Flint bus schedules to demonstrate that Person and Murphy could not have spent time together and Murphy could not have witnessed the shooting. They contend that, if Murphy and Shamonica boarded a bus at the community center at 6:30 p.m., as Murphy mentioned without explanation to Sergeant Gaspar during his October 16, 2007 statement, he simply could not have met and spent time with Person. At trial, the two main defense theories advanced were that (1) Murphy's eyewitness identification of all four defendants lacked accuracy and trustworthiness, and (2) Murphy's version of events, spending time with Person in the hours leading up to the shooting and being present when the shooting occurred, constituted a complete fabrication. In support of the latter theory, defense counsel cross-examined the police officers who first arrived at the scene of the shooting whether they encountered Murphy. Officers Douglas McLeod and Michael Beaver responded in the negative. Other witnesses provided testimony that they saw the victim with other persons before the shooting. Shaquala Watson testified that she saw Person at the party store shortly before the shooting speaking to a man in his 40s or 50s and denied seeing Person with a young man. Ashlie Dye testified that she saw Person riding his bike shortly before the shooting began, but on cross-examination she testified that she had not seen a young black male running ahead of Person. On cross-examination by Hinton's counsel, Xavier Regimbal also testified that he did not see another man running past Person when he came upon Person's body on the ground after hearing gunshots.

During closing arguments, Edwards's counsel argued that the placement of the fired shell casings and Person's bicycle made Murphy's version of events "impossible," and that "it didn't happen the way Jarylle Murphy said." Edwards's counsel further argued that Murphy never even attended the scene of the shooting because "no other person says that [Murphy] is with [Person] in this case." Christian's counsel similarly argued that Murphy had not been with Person on October 9, 2007, or present at the scene of the shooting. Christian's counsel implied that Murphy may have been forced to testify falsely because of his gang affiliations. Hinton's counsel argued that Murphy had not been with Person on the day of the shooting and asserted that Sinan Asmaro and Shaquala did not see Murphy with Person shortly before the shooting. Hinton's counsel contended that Murphy's testimony amounted to a "fantastic story," in essence fabricated because

of his gang affiliations. The record reflects that defendants each advanced the theory at trial that Murphy fabricated his testimony because he had neither been with Person on October 9, 2007, nor present at the time of the shooting. Defendants based the defense theory on several witnesses whose trial testimonies supported this theory, and their respective counsel argued extensively in this regard during closing argument. Despite their targeted attacks on Murphy's credibility, the jury returned verdicts convicting all three defendants of the first-degree premeditated murder of Person and assault with intent to commit the murder of Murphy.

Review of the record as a whole indicates that the parties' respective counsel presented the jury substantial evidence from which they could determine the facts. The prosecution presented evidence that defendants perpetrated the charged offenses against Person and Murphy. Defense counsel effectively cross-examined the witnesses to cast doubt upon aspects of the prosecution's cases against defendants. The record, however, does not indicate that, had defendants had the October 16, 2007 statement, the outcome would have been different. The record in this case does not support defendants' contentions that a reasonable probability exists that had they had the transcript of Murphy's October 16, 2007 police interview, the results of their trial would have been different. *Chenault*, 495 Mich at 150-151.

The record establishes that the prosecution presented direct and circumstantial evidence from which the jury could find each defendant guilty beyond a reasonable doubt of the charged offenses independent of Murphy's testimony. Moore testified that Edwards repeatedly solicited him to kill Murphy because Murphy constituted a key witness against him at trial. According to Moore, Edwards offered a leather coat as a down payment, and he wrote Moore a letter to that effect. Testimony also identified Edwards as the person who secured the .380-caliber firearm from William Harris and that he told Harris that Person was going to be dealt with for his behavior. Shaquala, in her statement to the police, and Asmaro during his testimony at trial, placed Edwards near the party store that Person visited shortly before being shot. Dye testified that she saw Christian shooting at Person. Additionally, Moore testified that Christian explained to him that he felt threatened by Person selling drugs in his territory and planned to deal with him. Christian also asked Moore to kill Murphy and said he would pay Moore with proceeds he expected to receive from of a motor vehicle lawsuit. On October 13, 2007, a surveillance video camera at a Speedway gas station recorded Christian hiding the .380-caliber firearm, one of the weapons used to shoot Person that police identified from matching shell casings found at the scene where Person was shot. Harris also made a statement to the police in which he explained that he talked to Christian who bragged that "he's the one that made [Person] fall off the bike" and "they got him."

Moore testified that Christian told him that he and Hinton confronted Person before the shooting and that Hinton was one of the shooters. In the hours after the shooting, Hinton appeared at Laquashia Blake's home nervous and he expressed concern to Laquashia regarding the police presence in the area. She testified that Hinton told her the next day that he was not going to fold and that the police could not place him at the scene or pull my prints off any gun or bullets. Monica McGee recalled that, in the short period after the shooting, Hinton called his uncle, Christian, and the two talked about the media coverage of the shooting. Asmaro testified that Person had been in the party store and left after he and Hinton spoke. Asmaro testified that Edwards had been in a white care before the shooting. Asmaro testified that later he saw Person riding a bike accompanied by an African American young man that he did not know and just shortly after they left the store, Asmaro heard multiple gunshots. People entered the store and told him a shooting

happened across the street. Further, according to Harris, Hinton was in the car with Edwards at approximately 3:00 p.m. on October 9, 2007, when Edwards secured a firearm from Harris.

Analysis of the record evidence establishes that no reasonable probability exists that the result of defendants' trial would have been different had defendants had the transcript of Murphy's October 16, 2007 police interview. *Chenault*, 495 Mich at 150-151. We conclude that the jury's verdicts against defendants were worthy of confidence. Accordingly, the trial court did not abuse its discretion by denying defendants' motions for relief from judgment based on their claims of a *Brady* violation.

## B. FALSE AND MISLEADING TESTIMONY

Christian and Hinton both argue that the trial court erred by denying their motions for relief from judgment because of prosecutorial misconduct. Specifically, they contend that their right to a fair trial was undermined by the prosecutor's knowing presentation of false and misleading testimony, and failure to take affirmative steps to correct the false and misleading testimony. We disagree. This issue could not have been raised on direct appeal because it is predicated on the discovery of the transcript of Murphy's October 16, 2007 police interview, which was first obtained under a FOIA request in 2014. Accordingly, MCR 6.508(D)(3)(a) does not procedurally bar this claim.

The factual bases for this claim are: (1) Murphy provided false testimony at trial when he testified in a manner that was inconsistent with statements he gave in his October 16, 2007 police interview, and (2) Sergeant Gaspar provided false or misleading testimony during the following exchange at trial on cross-examination by Dartanion's counsel:

> *Q.* And you first met Mr. Murphy when you said his grandparents brought you in the office?
>
> *A.* Yes.
>
> *Q.* Brought him into the office. I'm sorry.
>
> *A.* Yes, sir.
>
> *Q.* And you interviewed Mr. Murphy and you made a transcription of the interview that took place. Isn't that true?
>
> *A.* I'm sorry?
>
> *Q.* Did you transcribe his interview?
>
> *A.* Mr. Murphy's?
>
> *Q.* Yes.
>
> *A.* The first one?

-11-

*Q*. Well, how many interviews did you have?

*A*. We did two.

*Q*. Okay. Did there come a point when you transcribed an interview that took place between you and Mr. Murphy?

*A*. Yes. I think that was in November.

*Q*. Okay. Was that the first interview or the second interview?

*A*. Number two.

In *Giglio v United States*, 405 US 150, 151-152; 92 S Ct 763; 31 L Ed 2d 104 (1972), the petitioner's coconspirator testified against the petitioner at trial. During his testimony, he stated that he had not yet been prosecuted and the prosecutor informed the jury that the witness had not been promised that he would not be indicted. However, after the petitioner filed a motion for a new trial on the basis of newly discovered evidence, it became clear that the initial United States Attorney who dealt with the coconspirator witness had informed him that he would not be prosecuted if he cooperated with the government. *Id*. at 153. The United States Supreme Court recognized that if the prosecution acts to deliberately deceive the court and the jury by presenting evidence to the court and the jury that it knows to be false, or allows false testimony to go uncorrected when it is put forth, such action or inaction is inconsistent with the basic requirements of due process. *Id*.

In *Giglio*, the Supreme Court observed that the government's case against the petitioner relied primarily on the testimony of the coconspirator, and "without it there could have been no indictment and no evidence to carry the case to the jury." *Id*. at 154. Because the coconspirator's credibility was a central issue in the case, and evidence regarding any understanding or agreement between him and the government regarding whether he would also be prosecuted was relevant to his credibility, the Court held that such information should have been presented to the jury. *Id*. at 154-155.

Similarly, in *Napue v Illinois*, 360 US 264; 79 S Ct 1173; 3 L Ed 2d 1217 (1959), during the petitioner's murder trial, the main witness for the state, already serving a lengthy sentence for his participation in the same murder, testified that he had not received any promise of consideration from the prosecutor in exchange for his testimony, and although this information was incorrect, the prosecutor did not step in and correct the false testimony. *Id*. at 265. In fact, the prosecutor went on to specifically question the witness during redirect examination, inquiring if the prosecutor had promised the witness a reduction in sentence, and did nothing to correct the witness's testimony when he gave a false answer. *Id*. Because the prosecution used false testimony to secure the conviction of the petitioner, and such evidence "may have had an effect on the outcome of the trial," the Court reversed the judgment of the Illinois Supreme Court affirming the petitioner's conviction. *Id*. at 267, 272.

In *People v Smith*, 498 Mich 466, 470, 476; 870 NW2d 299 (2015), in which the defendant was charged with armed robbery, MCL 750.529, and felony murder, MCL 750.316(1)(b), the Michigan Supreme Court, quoting *Napue*, 360 US at 269, acknowledged that the prosecution's

affirmative duty to correct the false testimony of a witness " 'does not cease to apply merely because the false testimony goes only to the credibility of the witness.' " However, while noting that the prosecution is not obligated to "correct every instance of mistaken or inaccurate testimony" and that it is the impact of the prosecution's failure to correct false testimony that is the dispositive question for a due-process analysis, the Court also recognized that serious concerns arise when the prosecution capitalizes on false testimony during trial. *Smith*, 498 Mich at 476. In *Smith*, one of the key prosecution witnesses gave incorrect testimony regarding whether he received compensation from the government for his testimony or prior cooperation in the case. His testimony and the overall impression from his testimony that was conveyed to the jury was false. *Id*. at 478. The prosecutor knew that the witness had received compensation but did nothing to correct the false testimony. In fact, the prosecution capitalized on it at trial both during questioning of the witness and during closing arguments, engaging in what the Supreme Court described as a blatant "obfuscation" while questioning the witness. *Id*. at 478-482.

Our Supreme Court held that the defendant was entitled to a new trial because of the "serious misimpression" arising from the witness's testimony, as well as the prosecution's exploitation of the false testimony, particularly because no physical evidence implicated the defendant in the charged murder, and his conviction was based on the testimony of only two witnesses "with significant credibility issues." *Id*. at 483. Because the prosecution made the witness's testimony the central feature of the people's case, it misled the jury to believe that the witness received no benefit for his testimony. The prosecution affirmatively exploited that false impression. The Court concluded that the effect of the incorrect testimony prejudiced the defendant and "there was a reasonable likelihood that the prosecutor's exploitation of [the witness's] misleading testimony affected the judgment of the jury." *Id*. at 487.

In this case, the record does not support Christian's and Hinton's argument that the prosecution acted in the same improper manner as the prosecutors in the *Giglio*, *Napue*, and *Smith* cases. Unlike those cases, nothing in the record indicates that the prosecution acted to deliberately deceive the trial court and the jury. The record does not support Christian's and Hinton's contentions that the prosecution either presented false testimony or allowed false testimony to stand uncorrected. Although it is undisputed that discrepancies existed between Murphy's statements in his October 16, 2007 police interview and his trial testimony, the record does not demonstrate that Murphy intentionally lied, gave false testimony, or perjured himself. Simply because a witness testifies at trial in a manner that is inconsistent with a prior statement does not mean that the witness's trial testimony is false. See *People v Bass*, 317 Mich App 241, 275; 893 NW2d 140 (2016) ("Although an inconsistent prior statement may be a mechanism to impeach a witness's credibility at trial, it is not definitive evidence that the trial testimony is false."). The record reflects that Murphy's statements during the two police interviews, his testimony at the preliminary examination, and his trial testimony varied in details and discrepancies existed. Defense counsel pointed out on cross-examination at trial many discrepancies. Nevertheless, Murphy's statements and his testimonies were consistent respecting the substantive facts about which he testified. Further, comparison of the summary of Murphy's October 16, 2007 interview written by Sergeant Gaspar and the transcription of that interview reveals that the two are predominantly the same particularly respecting the substantive facts contained therein. Analysis of the inconsistencies of Murphy's statements and testimonies does not permit the conclusion that he testified falsely at trial or that the prosecution elicited false testimony or sought to mislead the trial court and the jury. Defendants have failed to present any evidence to the contrary.

Sergeant Gaspar's trial testimony also does not indicate that she testified falsely or attempted to mislead the trial court and the jury. The record fails to establish that, at the time of trial, she knew that the October 16, 2007 interview had in fact been transcribed. Her testimony indicates only that she knew that the November interview of Murphy had been transcribed. Her testimony makes clear that she did not transcribe the October 16, 2007 interview and had no knowledge whether or when it may have been transcribed. Moreover, although the prosecution commented on Murphy's testimony in closing argument, particularly how Murphy's recollection of events was consistent with the physical evidence, nothing in the record remotely suggests that the prosecution knew that Murphy testified falsely or misled the trial court and jury, or that Sergeant Gaspar testified falsely or misled the trial court and jury. The prosecution's questioning of Sergeant Gaspar and its statements during closing argument do not indicate any intention to obfuscate or exploit any false or misleading testimony. Significantly, there is no indication in the record, and defendants have presented no evidence, that the prosecution knew of the existence of a transcript of Murphy's October 16, 2007 interview and undertook efforts to conceal it. Cf. *Smith*, 498 Mich at 478 (observing that "the prosecutor *knew* that [a prosecution witness] had given uncontroverted pretrial testimony that [a key prosecution witness] was compensated for information central to the formal prosecution of the defendant" and exploited misleading testimony during questioning of the witness as well as in closing argument). Therefore, we find no indication in the record in this case that false or misleading testimony affected the jury's judgment.[4]

## C. NEWLY DISCOVERED EVIDENCE

Christian argues that the October 16, 2007 transcript of Murphy's police interview constitutes newly discovered evidence entitling him to relief from his convictions. We disagree.

Michigan courts have traditionally been reluctant to grant new trials on the basis of newly discovered evidence. This policy is consistent with encouraging parties to exercise care, diligence, and vigilance in obtaining evidence and presenting it at trial. *People v Grissom*, 492 Mich 296, 312; 821 NW2d 50 (2012). In *Johnson*, 502 Mich at 566, quoting *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003), our Supreme Court explained:

> In order for a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial."

Respecting the fourth requirement, a court must consider not only the evidence presented at trial, but also the evidence that would be presented at a retrial. *Johnson*, 502 Mich at 571. Impeachment

---

[4] Given our rejection of defendants' claims of (1) a *Brady* violation, and (2) that the prosecutor knowingly presented and failed to correct false testimony, Christian's claim that cumulative error undermined his right to a fair trial is also unavailing.

evidence can provide grounds for a new trial if it meets the four requirements set forth in *Cress*. *Grissom*, 492 Mich at 319. As explained in *Grissom*:

> [N]ewly discovered impeachment evidence satisfies *Cress* when (1) there is an exculpatory connection on a material matter between a witness's testimony at trial and the new evidence and (2) a different result is probable on retrial. [*Id.*]

When considering newly discovered impeachment evidence, therefore, the trial court is required to consider "the new evidence and determine whether there exists an exculpatory connection between it and the heart of the complainant's testimony." *Id.* at 321.

The parties seem to agree regarding the first and third factors in *Cress*, that the October 16, 2007 transcript was newly discovered[5] and that Christian, exercising reasonable diligence, could not have discovered and presented this evidence at trial. The prosecution and Christian disagree, however, regarding whether this transcript would have been cumulative of other evidence, with Christian essentially claiming that Murphy's statements in the October 16, 2007 transcript were so different from those in his November 8, 2007 interview and his trial testimony that it would have amounted to a completely different tool with which to impeach Murphy and Sergeant Gaspar. The prosecution counters that Christian, as well as the three other defendants, had ample opportunity in which to impeach Murphy's trial testimony.

Analysis of Murphy's October 16, 2007 interview transcript in comparison with Sergeant Gaspar's summary indicates that the two are predominantly similar, albeit the summary left out some details. The transcribed interview largely consists of cumulative evidence. Even accepting Christian's contention that the October 16, 2007 interview transcript would not have been cumulative, a "material, exculpatory connection" does not exist between the transcript and "significantly important evidence" presented at Christian's trial. *Grissom*, 492 Mich at 300. Further, Christian has failed to establish the fourth *Cress* factor. We are not convinced that the new evidence, Murphy's October 16, 2007 interview transcript, would make a different result probable on retrial. *Id.*; *Cress*, 468 Mich at 492.

The record reflects that the prosecution presented at trial the testimonies of witnesses other than Murphy who provided eyewitness identification of defendants as the perpetrators of the charged offenses. Further, the prosecution presented circumstantial evidence and ballistics evidence from which the jury could find defendants guilty beyond a reasonable doubt of Person's shooting death. Specifically, Dye, who professed her fear of Christian and testified under a material witness warrant after she had been threatened and intimidated by him, testified that she clearly saw Christian shooting at Person as she drove by, that her vehicle was hit by stray gunfire, and that Christian later called her to apologize. Moore provided detailed testimony of his

---

[5] However, the prosecution argues that the transcript of the October 16, 2007 interview was not material because the materiality analysis related to a *Brady* claim is essentially identical to a materiality analysis for a claim of newly discovered impeachment evidence under *Grissom*. The prosecution contends that the trial court correctly determined, in the context of evaluating Christian's *Brady* claim, that the transcript was not material, and that determination should be dispositive of this claim of error as well.

-15-

conversations with Christian in which he described that Christian told him that Person sold drugs in Christian's territory without Christian's permission, and that after confronting Person, Christian decided that Person needed to "be dealt with." Moore also testified that Christian told him that he and his accomplices knew that Person was going to the party store near the Regency apartment complex, and they laid in wait until Person left the store and walked back to the apartment complex pushing his bike. Moore recounted that Christian told him that when the group of men shot Person, "they let loose" and Christian himself "emptied a clip." Moore testified that Christian asked him to kill Murphy for payment from proceeds Christian expected to receive from a lawsuit settlement.

Further, the prosecution presented evidence that, on October 13, 2007, a surveillance camera at a Speedway gas station recorded Christian hiding the .380-caliber firearm, and that shell casings recovered at the scene of Person's shooting were determined to have been fired from that gun. The prosecution also presented Harris's statement to the police in which he explained that Christian bragged that "he's the one that made [Person] fall off the bike" and "they got him." The record reflects that the prosecution presented sufficient evidence of Christian's guilt independent of Murphy's statements and testimonies. The availability of the transcript of Murphy's October 16, 2007 interview on retrial would not affect the result of the proceedings. Accordingly, Christian is not entitled to relief and the trial court did not err in denying his motion for relief from judgment.

D. INEFFECTIVE ASSISTANCE OF COUNSEL

Hinton argues that he is entitled to relief from his convictions because his trial counsel provided ineffective assistance, his former appellate counsel provided ineffective assistance, and that he is actually innocent. Edwards similarly argues that his trial counsel provided him ineffective assistance. We disagree.

Claims of ineffective assistance of counsel present mixed questions of fact and constitutional law. *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019). We review for clear error the trial court's factual findings and review de novo issues of constitutional law. *Id.* In *Traver*, this Court explained:

> A defendant seeking relief based on a claim of ineffective assistance must show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant. Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise. The measure of an attorney's performance under the first prong of the analysis is simply reasonableness under prevailing professional norms. In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy. This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight. [*Id*. at 422-423 (quotation marks and citations omitted).]

In *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted), our Supreme Court explained that prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." The

same test applies to a claim alleging ineffective assistance of appellate counsel. *People v Uphaus*, 278 Mich App 174, 186; 748 NW2d 899 (2008). A defendant must establish that appellate counsel's performance "fell below an objective standard of reasonableness and prejudiced his appeal." *Id.* A defendant must establish the factual predicate for his claim of ineffective assistance of counsel. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

Hinton argues that his trial counsel provided ineffective assistance by failing to investigate Anthony Williams and call him as a witness at trial and by failing to call Joanna Tedford in support of Hinton's alibi defense. We disagree.

Preliminarily, although Hinton raised other allegations of ineffective assistance of counsel on direct appeal, he did not challenge specifically trial counsel's failure to investigate or call Williams as a witness. A review of Hinton's amended supplemental brief on direct appeal reveals that while Hinton complained generally that trial counsel did not make any investigation or interview any potential witnesses before trial, he did not mention trial counsel's failure to call Williams as a witness. Accordingly, to the extent that Hinton could have raised this issue on direct appeal, he must establish "good cause" for his failure to do so, as well as "actual prejudice," which, regarding a conviction following a jury trial, requires that he show that "but for the alleged error," Hinton would have had a reasonable chance of acquittal. MCR 6.508(D)(3)(a) and (b)(i).

Respecting his trial counsel's failure to call Tedford at trial, appellate counsel raised this ineffective assistance of counsel claim on direct appeal and this Court rejected it. Therefore, under MCR 6.508 in effect at the time Hinton filed his motion for relief from judgment and when the trial court decided the motion, the trial court could not grant him relief from judgment on this ground unless he established "that a retroactive change in the law has undermined the prior decision." MCR 6.508(D)(2).[6]

On direct appeal in Docket No. 291687, appellate counsel moved to remand on June 1, 2010, and argued generally that trial counsel performed in a constitutionally deficient manner.

---

[6] We note, however, that MCR 6.508 was amended, effective January 1, 2020, to allow a defendant to seek relief from judgment on a claim previously decided against him under the following circumstances:

> [F]or purposes of this provision, a court is not precluded from considering previously-decided claims in the context of a new claim for relief, such as in determining whether new evidence would make a different result probable on retrial, or if the previously-decided claims, when considered together with the new claim for relief, create a significant possibility of actual innocence[.]

Even if the amended court rule applied to Hinton's claim, he would not be entitled to relief, given that consideration of his claim that Tedford's testimony would have established an alibi in the context of his new claims for relief, a different result would not be probable on retrial. Additionally, the claim regarding trial counsel's failure to call Tedford as an alibi witness at trial, even when considered with Hinton's new claims for relief in the present appeal, does not create a significant possibility of actual innocence.

However, appellate counsel did not specify that trial counsel's performance fell below an objective standard of reasonableness respecting (1) failing to investigate Williams, (2) failing to call Williams as a witness, or (3) failing to call Tedford as an alibi witness. The motion did not include any affidavit of Tedford stating her proposed testimony. On June 21, 2010, however, appellate counsel sought leave to file an amended supplemental brief containing numerous additional appellate issues, one of which concerned the claim that trial counsel provided ineffective assistance by failing to call Tedford as an alibi witness. In support of this motion, Hinton submitted Tedford's June 10, 2010 affidavit in which she averred that Hinton was at her home on the night of the shooting and did not leave until the next morning, and that while trial counsel had contacted her and she had spoken to a private investigator, she was not contacted again after speaking to the private investigator. This Court granted the motion to file an amended supplemental brief, but denied the motion to remand. *People v Hinton*, unpublished order of the Court of Appeals, entered July 15, 2010 (Docket No. 291687). Because Tedford's June 10, 2010 affidavit was not part of the lower court file, this Court did not consider it on direct appeal. *Hinton*, unpub op at 15 n 8.

The thrust of Hinton's argument challenging appellate counsel's performance relates to his contention that his then appellate counsel failed to properly raise the ineffective-assistance claims by failing to create a proper factual record. In particular, Hinton faults appellate counsel for not filing a motion for an evidentiary hearing[7] in the trial court and not filing a motion to remand in this Court. Hinton, however, has failed to establish that appellate counsel's performance fell below an objective standard of reasonableness.

The record reflects that Hinton retained appellate counsel who substituted as counsel of record on May 21, 2010, replacing Hinton's appointed counsel. On June 1, 2010, his new appellate counsel filed in this Court a motion to remand for leave to file a motion for new trial in the trial court. That motion argued among other things that Hinton's trial counsel generally provided ineffective assistance. This Court denied the motion to remand but granted Hinton's motion to file a supplemental appeal brief. Hinton's appellate counsel then filed an amended supplemental appeal brief which argued that Hinton's trial counsel provided ineffective assistance by not investigating and calling Tedford, Hinton's alibi witness, who would have corroborated Mickey Jones's testimony that placed Hinton near Tedford's house and not at the shooting. The brief also argued that Hinton's trial counsel provided ineffective assistance by not investigating other witnesses.

This Court considered Hinton's ineffective assistance arguments in his direct appeal and rejected them. Regarding his claim that trial counsel performed deficiently by not calling Tedford and by not investigating and calling other witnesses, this Court explained its decision as follows:

> Defendant Hinton also argues that trial counsel was ineffective for failing to call Joanna Tedford as an alibi witness at trial. A defense attorney's failure to call a witness can constitute ineffective assistance of counsel only where it deprives the defendant of a substantial defense. *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). A substantial defense is one that might have made a difference in the outcome of the trial. *In re Ayres*, 239 Mich App 8, 22; 608 NW2d

---

[7] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

132 (1999). Here, the record reflects that trial counsel filed a pretrial notice of alibi, which indicated that defendant Hinton would claim that he was with Tedford at the time of the shooting. In addition, it appears that counsel contemplated calling Tedford at trial because her name was mentioned as a potential witness during jury voir dire. During closing argument, defendant Hinton's counsel commented that Tedford "didn't come in," but stated that there was other evidence, including the testimony of Mickey Jones and defendant [Edwards], to establish defendant Hinton's alibi.

A defendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Here, the record discloses that defendant Hinton's counsel was aware of Tedford's status as a potential alibi witness, and contemplated calling her at trial, but does not disclose why Tedford was not called, or what steps trial counsel may have taken to obtain Tedford's appearance. The limited record presented is insufficient to conclude that the failure to call Tedford at trial was due to some deficiency on the part of trial counsel. See *People v Rockey*, 237 Mich App 74, 77; 601 NW2d 887 (1999).

Furthermore, because there is no record of Tedford's proposed testimony, defendant Hinton cannot establish that the failure to call Tedford deprived him of a substantial defense. Even assuming that she would have testified consistently with Mickey Jones and defendant [Edwards], "[t]he number of witnesses a party garners is quite irrelevant in determining where the truth lies." *People v Hagle*, 67 Mich App 608, 617; 242 NW2d 27 (1976). "[T]he presentation of only one witness has the advantage of eliminating the possibility of distracting inconsistencies." *Carbin*, 463 Mich at 604. Because the apparent subject matter of Tedford's testimony was supplied by other witnesses, it is not apparent that the failure to call Tedford was either objectively unreasonable or prejudicial. The failure to call Tedford did not deprive defendant Hinton of a substantial defense. Accordingly, this ineffective assistance of counsel claim cannot succeed.

Defendant Hinton also argues that trial counsel failed to adequately investigate the case or interview potential witnesses. "A defendant is entitled to have his counsel prepare, investigate, and present all substantial defenses." *In re Ayres*, 239 Mich App at 22. Here, however, defendant Hinton has not established any factual support for his claim. Therefore, this ineffective assistance of counsel claim also cannot succeed. *Carbin*, 463 Mich at 600. [*Hinton*, unpub op at 15-16.]

Hinton essentially makes the same arguments in this appeal as he did in his direct appeal. In this appeal, however, he attached affidavits to his appeal brief. One by Tedford indicates that she would have testified if called at trial that Hinton stayed overnight at her house on the night of Person's shooting and did not go out. Another by Williams states that he went inside for dinner at his mother's house, heard shots fired, and went outside and saw Person on the ground with people surrounding him. As in his direct appeal, we are not persuaded that either Hinton's trial counsel or his appellate counsel provided him ineffective assistance.

Defendant has failed to "show that '(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different.' " *People v Jurewicz*, ___ Mich ___; 948 NW2d 448 (2020), quoting *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012), and citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 LEd2d 674 (1984).  Indeed, the record reflects that Hinton's trial counsel elicited testimony from Jones and Edwards that supported Hinton's alibi that he was not present at Person's shooting.  Further, trial counsel challenged Murphy's credibility regarding his testimony about Hinton's presence and participation in the shooting.  Hinton's trial counsel presented his alibi defense without calling Tedford or Williams.  Trial counsel's decisions in this regard appear to have been strategic and not the result of deficient performance.  Tedford's proposed testimony would have been cumulative.  Williams's proposed testimony would not have challenged the prosecution witnesses accounts of the events leading up to and including Person's shooting or established Hinton's innocence.  Williams's testimony of his view of the scene after the shooting provided little if any support for Hinton's defense.  Hinton, has failed to demonstrate that his trial counsel's performance fell below an objective standard of reasonableness by not calling these two witnesses.  Further, even if we deem trial counsel's performance deficient, we are not persuaded that but for his counsel's unprofessional errors, the result of the proceeding would have been different.  The record establishes that Hinton's defense theory and the evidence supporting it failed to persuade the jury to reasonably doubt the prosecution's witnesses' testimonies, or the direct and circumstantial evidence that placed Hinton not only at the shooting but as one of the shooters.  Accordingly, the trial court did not err by denying Hinton relief from judgment.

Respecting appellate counsel's performance, the record reflects that counsel made strategic decisions regarding the issues on which to appeal and reasonably advanced and argued Hinton's claims of error to this Court.  We are not convinced that appellate counsel's performance fell below an objective standard of reasonableness.  Moreover, the fact that appellate counsel did not pursue the alleged failure to investigate Williams or call him as a witness did not prejudice Hinton because the substance of Williams's proposed testimony would not have advanced Hinton's defense.  Hinton's trial counsel presented an objectively reasonable defense at trial through other witnesses and evidence, and effective cross-examinations of the prosecution's witnesses.  Appellate counsel's failure to establish that trial counsel's ineffective assistance did not prejudice Hinton because Hinton's trial counsel actually presented Hinton's alibi defense through the testimony of both Edwards and Jones.

Moreover, the record does not support Hinton's contention that if trial counsel had investigated and called Williams and Tedford as witnesses, it is reasonably likely that Hinton would have been acquitted.  During closing argument, trial counsel asserted that Hinton was not at the scene of the shooting because he was with Tedford.  The record reflects that trial counsel also argued that the physical evidence did not support Murphy's version of events and that he failed to testify truthfully about being with Person at the time of the shooting because the prosecution had not linked any physical evidence, such as shell casings, DNA, or fingerprints to Hinton as one of the assailants.  Trial counsel also pointed out that witnesses testified that Person was alone when he visited the store, and Dye testified that she saw no one with Person at the time of the shooting.  Williams's affidavit indicates that he would have offered nothing of value in this regard.  He admitted that he was inside his mother's house and never witnessed the shooting.  The record establishes that Hinton's trial counsel did not deny him effective assistance of counsel.

Therefore, Hinton has not established the factual predicate for this aspect of his claim that trial counsel's performance was objectively deficient. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

Hinton has also failed to establish a reasonable probability that, but for trial counsel's alleged errors, the result of his trial would have been different. *Randolph*, 502 Mich at 9; *Trakhtenberg*, 493 Mich at 51. This is because Hinton did put forth an alibi defense at trial, with both Jones and Edwards testifying that he was at Tedford's house when Person was shot. Additionally, Murphy was questioned extensively on cross-examination by counsel for all four defendants regarding his identification of Hinton. Moreover, other witnesses provided evidence supporting the defense theory that Murphy was not with Person during the time leading up to the shooting or during the shooting itself. Hinton's trial counsel, as well as Dartanion's counsel, argued that the evidence at trial supported a conclusion that Murphy was not even with Person during the hours leading up to and at the time of the shooting. Because the theory that Murphy was not with Person at the time of the shooting was thoroughly presented to the jury, Hinton has not overcome the presumption that trial counsel had strategic reasons for not calling Williams and Tedford as witnesses. Further, Hinton has not established a retroactive change in the law that has undermined this Court's prior decision. Therefore, the trial court did not err by denying his motion for relief from judgment.

Edwards contends that his trial counsel provided him ineffective assistance by not requesting a transcript of Murphy's October 16, 2007 police interview. Even assuming that his trial counsel performed defectively by not requesting the transcript, Edwards has failed and cannot establish that but for trial counsel's alleged deficient performance, the result of his trial would have been different. *Randolph*, 502 Mich at 9; *Trakhtenberg*, 493 Mich at 51. This Court determined in Edwards's direct appeal that the record established that substantial evidence presented by the prosecution sufficed to enable the jury to find beyond a reasonable doubt that Edwards committed the charged offenses. Further, for the reasons previously discussed in this opinion, even supposing defense counsel had obtained Murphy's October 16, 2007 police interview transcript and used it to impeach his credibility, the prosecution presented more than ample evidence other than Murphy's trial testimony to enable the jury to find beyond a reasonable doubt that Edwards committed the charged offenses. Accordingly, Edwards claim of ineffective assistance fails.

### E. ACTUAL INNOCENCE

Hinton also argues that he is entitled to relief because of his actual innocence. In *Swain*, 288 Mich App at 636-637, the defendant argued that MCR 6.502(G)'s prohibition against successive motions for relief from judgment must yield in instances where a defendant can demonstrate that his constitutional rights were violated and his actual innocence. This Court noted that under United States Supreme Court precedent, a defendant whose claim is otherwise barred in a federal habeas proceeding may have his claim heard on the substantive merits if the defendant makes a threshold showing of actual innocence. After analyzing *House v Bell*, 547 US 518, 536-538; 126 S Ct 2064; 165 L Ed 2d 1 (2006), and *Schlup v Delo*, 513 US 298, 327; 115 S Ct 851; 130 L Ed 2d 808 (1995), this Court concluded that prisoners claiming actual innocence must demonstrate that it is more likely than not that no reasonable juror would have found the defendant guilty beyond a reasonable doubt. *Swain*, 288 Mich App at 637. This Court explained:

To satisfy the "actual innocence" standard, a defendant "must show that it is more likely than not that no reasonable juror would have found [the defendant] guilty beyond a reasonable doubt." *Schlup*, 513 US at 327, 115. This standard does not require absolute certainty about the defendant's guilt or innocence. *House*, 547 US at 538. It is, however, a demanding standard and permits review only in "extraordinary" cases. *Id*.; *Schlup*, 513 US at 327. [*Swain*, 288 Mich App at 638 (alteration in original).]

In considering whether a defendant has satisfied the "actual innocence" standard, an appellate court defers to the trial court's assessment of new evidence in the context of a holistic judgment about all of the evidence and its likely impact on the jury adhering to the reasonable doubt standard. *Id*. at 640. All of the evidence, "old and new, incriminating and exculpatory, must be considered." *Id*. (citation omitted).

Review of all of the evidence establishes that Hinton has failed and cannot meet the threshold showing of "actual innocence." Although DNA and other physical evidence did not link him to Person's murder, such evidence also does not establish his actual innocence. Hinton ignores the body of incriminating evidence. Considering the evidence in its totality, he has not demonstrated that it is " 'more likely than not that no reasonable juror would have found [the defendant] guilty beyond a reasonable doubt.' " *Swain*, 288 Mich App at 638, quoting *Schlup*, 513 US at 327. Witnesses placed Hinton at the scene interacting and identified him as a shooter and testified regarding his incriminating conduct after the shooting. Therefore, Hinton has failed to establish his actual innocence.

CONCLUSION

In all three appeals, the trial court did not abuse its discretion by denying defendants' respective motions for relief from judgment on any of the grounds asserted by them.

Affirmed.

/s/ Anica Letica
/s/ Kirsten Frank Kelly
/s/ James Robert Redford